# EXHIBIT A

# QUITCLAIM DEED

**JOAN M. CARLONE** of the Town of West Warwick, State of Rhode Island AND **SCOTT T. CARLONE**, of the Town of Coventry, State of Rhode Island

For no consideration paid, grant to: **JOAN M. CARLONE** of the Town of West Warwick, State of Rhode Island

As Sole Owner

*See attached Exhibit "A"*

THE GRANTORS NAMED HEREIN DO HEREBY COVENANT THAT THIS TRANSFER IS SUCH THAT NO R.I.G.L. SECTION 44-30-71.3 WITHHOLDING IS REQUIRED. THIS IS NOT A SALE.

SUBJECT TO TAXES ASSESSED DECEMBER 31, 2012.

NO DOCUMENTARY STAMPS ARE REQUIRED, AS THIS IS NOT A SALE.

SUBJECT TO ENCUMBRANCE OF RECORD.

JOAN M. CARLONE

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick, in said County, on the 20th day of August, 2013, before me personally appeared **JOAN M. CARLONE**, to me known and known by me, to be the party executing the foregoing instrument, and she acknowledged said instrument, by her executed, to be her free act and deed.

Notary Public *Patricia A. Sullivan*
My Commission Expires: 8/01/2017

Received In West Warwick R.I.
Date Aus 26,2013 Time 11:48A
Paula Iannitelli, Deputy Town Clerk
INST: 00004297
Bk: 2263 Ps: 113

**SCOTT T. CARLONE**

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick, in said County, on the 20th day of August, 2013, before me personally appeared **SCOTT T. CARLONE**, to me known and known by me, to be the party executing the foregoing instrument, and he acknowledged said instrument, by his executed, to be his free act and deed.

Notary Public
My Commission Expires: 6/20/17

*Prepared by:*
**PATRICIA A. SULLIVAN, ESQUIRE**
300 Centerville Road
Summit West-Suite 300
Warwick, Rhode Island 02886
(401)732.8300

*Property Address:*
3 Arrow Court
West Warwick, Rhode Island 02893

*Return to:*
Joan Carlone
3 Arrow Court
West Warwick, Rhode Island 02893

Doc # 00004297
BOOK 2263 PAGE 114

## EXHIBIT A

That certain tract or parcel of land with all the buildings and improvements thereon, laid out and designated as Lot No. 144 (one hundred forty four) on that plant entitled, "FINAL FOR NOTTINGHAM ESTATES SECTION NO. 4 situated in West Warwick, Rhode Island (A.P. 12 Lots 1, 27, 28, 31, & 32) OWNER/DEVELOPER TRI-TOWN ASSOCIATES BY: KIRK D. ANDREWS Registered Land Surveyor", which plat is recorded in the Land Evidence Records in the Town of West Warwick in Plat Book 3 at pages 53, 54, and 55.

Subject to easements and set back lines of record.

Subject to any present or future sewer assessments of record.

Doc # 00004297
BOOK 2263 PAGE 115

# Exhibit B

39- 573

ORIG LOT
28
PARCEL 2
ONLY

# Quit-Claim Deed

JOHN KRAWCZUK, also known as JOHN KRAWCZUCK of the Town of West Warwick,

County of Kent and State of Rhode Island

_____ for consideration paid,

grant to   NORMAN GILLESPIE of the Town of West Warwick, County of Kent and State of

of _____ Rhode Island _____ with quit-claim covenants

That certain real estate situated in _____ County of _____

State of Rhode Island, and described as follows:

all my right title and interest in and to:

Two (2) certain parcels of land located in the Town of West Warwick
County of Kent and State of Rhode Island known and described as follows:

ONE: Lots numbered twenty-one (21), twenty-two (22), twenty-three (23)
and twenty-six (26) on Assessor's Plat No. 12, which plat is on record
in the Tax Assessor's Office in the Town of West Warwick. Said parcel
of land is bounded Northerly by the Green Bush Road, so-called, Easterly
by land of Fritz Krentz, et ux and William Wicks, Southerly by land of
Frank and Wilhemina Dubis and Westerly by land of Frank Szydlo and land
of C. Henry Hawkinson, et al. Said land containing by estimate twenty-
two and a half (22½) acres, be the same more or less. Being the same
premises conveyed by deeds recorded in the Land Evidence Records of the
Town of West Warwick in deed books 28 at page 57), deed book 34 at
page 59 and deed book 28 at page 306.

TWO: A certain parcel of land known and described as lot numbered twenty-
eight (28) on Assessor's Plat 12 in the Town of West Warwick which plat
is recorded in the Tax Collector's Office in said Town of West Warwick.
Said land is bounded Northerly by land of Albert Lussier, et al, Easterly
by land of Frank Szydlo and by land of Anthony Perry, Southerly by land
of John C. Carlson and Westerly by the West Warwick-Coventry Town Line.
Being the same premises conveyed by deed recorded in deed book 25 at
page 147 of the Land Evidence Records of the Town of West Warwick.

JOHN KRAWCZUK covenants that he is unmarried.

The grantor reserves unto himself forever hunting and fishing privileges
upon said conveyed premises.

Stamps $1.50

_____ husband of the grantor wife.

release to the grantee a all _____ and curtesy _____ eight- and curtesy _____ dower _____ and all other interest in the aforedescribed premises.

Witness __my__ hand this _____ 29th _____ day of _____November_____ 19 51.

John Krawczuk

John Krawczuk

STATE OF RHODE ISLAND,   Etc.

County of _____Kent_____

In __West Warwick__ on the _____ 29th _____ day of _____November_____ 19 51

before me personally appeared _____ John Krawczuk _____

to me known and known by me to be the party _____ executing the foregoing instrument, and _____ he _____ acknowledged said
instrument by __him__ executed, to be __his__ free act and deed.

Harry F. McKenna, Jr.
Notary Public

Recorded     December 18, 1951

at __4:15__ o'clock __P. M.__     Witness:

Susan J. Lamb

Town Clerk

159

50-158

# Quit-Claim Deed

CHG LOT
27

We, the undersigned Willie J. Regnaiere et ux Yvonne Regnaiere, both of the Town of
West Warwick County of Kent and State of Rhode Island for consideration paid,
grant to Anthony Perry of the City of Warwick, County of Kent and State of Rhode Island

(Description, and encumbrances, if any)                     with quit-claim covenants

That certain lot or parcel of land, with any and all improve-
ments thereon, which said lot may be described as Assessors Lot 27,
on Assessors Plat 12, meaning and intending to reconvey to the grantee
those premises purchased at tax sale on July 12th, 1961 and recorded in
Book 50 at Page 445.

We, Willie J. Regnaiere et ux Yvonne Regnaiere                          husband of the grantor s

release to the grantee   all   our   right of dower and all other interest in the aforedescribed premises.

Witness   our   hands this   2nd   day of   June   19 62.

Willie J. Regnaiere

Yvonne Regnaiere

STATE OF RHODE ISLAND, Etc.
County of   KENT

In   West Warwick   on the   2nd   day of   June   19 62
before me personally appeared   Willie J. Regnaiere and Yvonne Regnaiere

to me known and known by me to be the part ies   executing the foregoing instrument, and   they   acknowledged said
instrument by   them   executed, to be   their   free act and deed.

Robert J. Harrop
Notary Public

Recorded   June 4, 1962
at 12:38   o'clock P. M.   Witness:

Susan Friant
Town Clerk

# Warranty Deed

51 — 317

I, JOHN G. CARLSON, of the Town of West Warwick, in the State of Rhode Island

grant to MYself, JOHN G. CARLSON and wife, ALLEN G. CARLSON, both of the Town of West Warwick, in the State of Rhode Island, as JOINT TENANTS and not as tenants in common,

That tract of land, with all buildings and improvements thereon, situated in the Town of West Warwick and a small portion on the southerly end in the Town of East Greenwich, County of Kent, and State of Rhode Island, containing by estimation thirty (30) acres of land, more or less, bounded and described as follows:-

Commencing at the southeasterly corner of said tract at a point on the northerly side of the highway known as Crompton Road or Shippeetown Road which divides the Town of West Warwick and east Greenwich at some points said point of beginning being at the southwesterly corner of land of P. Robert Bergsten et al, and thence running westerly bounding southerly on said highway to land formerly owned by Benjamin Wood, deceased; thence northerly bounding westerly on said Wood land to land formerly of William Clapp and now or lately of Norman Gillespie et a stump with stones around it; thence easterly bounding northerly on said Gillespie land to a stake and stones at land formerly of Slocum Godfrey and now or lately of George W. Godfrey; thence southerly bounding easterly in part on said Godfrey land and in part on land formerly of James E. Brown and now or lately of P. Robert Bergsten et al to the point of beginning.

Being the same premises conveyed by deed of Patrick Nolan to Peter W. Nolan, dated January 11, 1898, and recorded in the records of Land Evidence in said West Warwick in Book 59 at page 499.

The consideration for this deed is such that no documentary stamps are required.

Witness my hand this  8th  day of  November  19 61.

John G. Carlson

STATE OF RHODE ISLAND
County of  KENT

In  West Warwick  on the  8th  day of  November  19 61 before me personally appeared  John G. Carlson

to me known and known by me to be the part Y  executing the foregoing instrument, and  he  acknowledged said instrument by  him  executed, to be  his  free act and deed.

Lillian K. Johnson
Notary Public

Recorded  December 19, 1961
at 3:40  o'clock  P. M.,                    Witness:

Town Clerk

61 - 468

# Warranty Deed

I, F. ROBERT BERGSTEN of East Greenwich, County

of ____ Kent, State of Rhode Island _____ for consideration paid,
grant to ____ JOHN C. CARLSON and wife, ELLEN G. CARLSON, of West Warwick, County of Kent, State

of Rhode Island, as joint tenants and not as tenants in common, _____ with warranty covenants
(Description, and incumbrances, if any)

That certain parcel of land with any improvements thereon situated partly in the
Town of East Greenwich, State of Rhode Island, and partly in the Town of West Warwick,
State of Rhode Island and bounded and described as follows:

Beginning at a point in the northerly line of Crompton Road, said point being the
southeasterly corner of the parcel to be conveyed and the south westerly corner of land
of George T. McGlynn et ux, and said point being 0.35 feet westerly of a Rhode Island
Highway Bound; from thence running westerly bounded southerly by said Crompton Road
one hundred and 85/100 (100.85) feet to a point; thence turning an interior angle of
88° -06'-20" and running northerly, bounded westerly by land of the grantees eight hundred
sixty-four and 41/100 (864.41) feet; thence turning an interior angle of 91° -36' -00"
and running easterly along a stone wall, bounded northerly by land now or formerly of
Anthony Perry one hundred and 83/100 (100.83) feet to a point; thence turning en in-
terior angle of 88° 24'-00" and running southerly, bounded easterly by said McGlynn land
eight hundred sixty-four and 93/100 (864.93) feet to the point of beginning.

S T A M P S  $1.65

F. Robert Bergsten hereby covenant that I am unmarried

Witness    my    hand  this    25th    day of    June    19 62.

F. Robert Bergsten

State of Rhode Island   Etc.
County of   Providence
In    Providence    on the    25th    day of    June    19  62
before me personally appeared    F. Robert Bergsten

to me known and known by me to be the part    y    executing the foregoing instrument, and    he    acknowledged said
instrument by    him    executed, to be    his    free act and deed.

Edward N. Godfrey
Notary Public

Recorded    July 17, 1962
at 11:10    o'clock  A. M.    Witness:

Town Clerk

70 - 112

ORIG LOT
31

FRANK
SZYDLO
BACK TO
1912 IN
WARWICK

## ADMINISTRATOR'S DEED

I, FELIX A. APPOLONIA, of the Town of West Warwick, County of Kent, State of Rhode Island, Administrator of the Estate of Frank Szydlo, late of the Town of West Warwick, County of Kent, State of Rhode Island, by the power conferred upon me by the Decree of the Probate Court of the Town of West Warwick entered June 19, 1968, and by every other power me thereunto enabling, and for and in consideration of the sum of FIVE THOUSAND FIVE HUNDRED AND NO/100 ($5,500.00) DOLLARS to me paid, the receipt whereof is hereby acknowledged, do hereby grant, sell, release and convey unto NORMAN E. GILLESPIE and wife, NELLIE C. GILLESPIE, both of the City of Warwick, County of Kent, State of Rhode Island as Joint Tenants and not as tenants in common

A certain parcel of land situated in the Town of West Warwick, County of Kent and State of Rhode Island, and bounded and described as follows:

A certain tract of land situated within the Town of West Warwick, R. I., beginning at the northwest corner thereof, thence following a stone wall and fence in an easterly direction to an angle in the wall where it turns to the north, bounded northerly by land now or formerly of Michael Dalton and Daniel Hawkinson; from said angle in the wall the line runs in a southerly direction nearly following the course of the brook to a stone heap near the brook and is bounded easterly by land formerly of Arnold and Anwell but now of a Mrs. Lawrence; from the stone heap, the line runs in a westerly direction to the road bed of the present so-called Dark Entry road intersecting a stake and stones at the roadside and is bounded southerly by land formerly of John Krawczuk and George Godfrey; from the point in the road bed, the line runs in a northwesterly direction, following the road bed to the point in the road nearest to the beginning point and is bounded westerly on land formerly of Arthur James.

Being the same premises conveyed to Frank Szydlo, decedent, by deed dated July 24, 1912, and recorded in the office of the City of Warwick in Deed Book 83 at page 183 and a copy in West Warwick Record Book 13 at page 263.

112

<u>Page Two</u>

TO HAVE AND TO HOLD the aforegranted premises, with all the privileges and appurtenances thereunto appertaining unto and to the use of the said Grantees, their heirs and assigns forever as Joint Tenants.

Witness my hand this *13* day of *August*, A. D. 1968.

_Felix Appolonia_
Administrator of the
Estate of Frank Szydlo

STATE OF RHODE ISLAND
COUNTY OF KENT

In West Warwick on the *13* day of *August*, A. D. 1968, before me personally appeared FELIX A. APPOLONIA, to me known and known by me to be the party executing the foregoing instrument and he acknowledged said instrument by him executed to be his free act and deed as Administrator of the Estate of Frank Szydlo.

_Robert J. Hanson_
_Notary Public_
Notary Public

REC'D W. WARWICK, R.I. OCT 10 1968 AT 4:01 O'CLOCK P M
BOOK 70   PAGE 112-113   _Margaret C. Conlon_
Town Clerk

113

· 71 – 414

To the undersigned Anthony Perry, of the
City of Warwick, County of Kent and
State of Rhode Island

orig Lot
27

of

for consideration paid, grant to Norman K. Gillespie, also of
said City, County and State

of ...................................................................................with WARRANTY COVENANTS
(Description and Incumbrances, If Any)

A certain wood-lot, situated in the southeasterly
part of the Town of West Warwick, on the Dark Entry
Road, so-called, and is bounded northerly by land
now or formerly of Frank Szydlo; easterly by land
now or formerly of Frank and Wilhelmena Dubis;
southerly by the said Dubis land, formerly owned by
Fones Shippee; and westerly by land now or formerly of
the Patrick Nolan Estate, and is said to contain
twenty acres, more or less

NEG.
$5.60

To the undersigned Shirley E. Perry                    husband
                                                       of the granter
                                                       wife

release to said grantee     all     right of     and all other interest in the aforedescribed
premises.
                            dower

Witness our hand s       this         14th day of     August           19 70

State of Rhode Island, Etc.
County of KENT

In West Warwick      on the  14th  day of  August       19 70
before me personally appeared
                    Anthony Perry  and  Shirley E. Perry

to me known and known by me to be the parties executing the foregoing instrument, and
they acknowledged said instrument, by them executed, to be their free act and deed.
W. WARWICK, R. I.  AUG 14 1970 AT 2:33 O'CLOCK P.
Book  71  PAGE 414
                    Margaret C. Cullen   Notary Public
                    Town Clerk

414

76-709

ORIG LOT
27

PARCEL
III

DEED
247-355

........I, the undersigned, Norman R. Gillespie of the City of........
...Warwick, County of Kent and State of Rhode Island.....................

of ..........................................................................................................
for consideration paid, grant to....Tri-Town Construction Co., Inc., a duly....
...organized and existing Rhode Island Corporation its principal...........
...place of business in the Town of South Kingston, Washington County....
of State of Rhode Island......................................with **WARRANTY COVENANTS**

(Description and Incumbrances, if Any)

A certain wood-lot, situated in the southeasterly part of the Town of West Warwick, on the Dark Entry Road, so-called, and is bounded northerly by land now or formerly of Frank Szydlo; easterly by land now or formerly of Frank and Wilhelmena Dubis; southerly by the said Dubis land, formerly owned by Fonos Shippee; and westerly by land now or formerly of the Patrick Nolan Estate, and is said to contain twenty acres, more or less.

The consideration for this deed is such that no tax stamps are required.

...I, the undersigned, Nellie C. Gillespie......................... husband    of the granter
                                                                          wife

.............................................................................................................
release to said grantee   all my right of   xxxxxxx   and all other interest in the aforedescribed
premises.
                                              dower
**Witness our hands** this ..........    ....30th...day of ..September...... 19.72..

**State of Rhode Island, Etc.**
**County of** KENT

In West Warwick........on the.....30th.....day of ..September....... 19.72.
before me personally appeared.........Norman R. Gillespie and Nellie C. Gillespie

to me known and known by me to be the part...ies executing the foregoing instrument, and........
they....acknowledged said instrument, by them executed, to be their free act and deed.

REC'D W. WARWICK, R.I. OCT 19 1972 AT 4420 O'CLOCK P. M. ...................
BOOK 26 PAGE 709

Margaret C. Conlon
Town Clerk

709

76-710

ORIG LOT
31

PARCEL IV

DEED
247-355

We, the undersigned, Norman E. Gillespie, et. ux. Nellie C. Gillespie, of the City of Warwick, County of Kent and State of Rhode Island

of ........................................................................................................... for consideration paid, grant to.....Tri-Town Construction Co., Inc., a duly organized and existing Rhode Island Corporation, its principal place of business in the Town of South Kingston, Washington County of State of Rhode Island............................. with QUIT-CLAIM COVENANTS

(Description and Incumbrances if Any)

A certain parcel of land situated in the Town of West Warwick, County of Kent and State of Rhode Island, and bounded and described as follows:

A certain tract of land situated within the Town of West Warwick, R. I, beginning at the northwest corner thereof, thence following a stone wall and fence in an easterly direction to an angle in the wall where it turns to the north, bounded northerly by land now or formerly of Michael Dalton and Daniel Hawkinson, from said angle in the wall the line runs in a southerly direction nearly following the course of the brook to a stone heap near the brook and is bounded easterly by land formerly of Arnold and Angell but now of a Mrs. Lawrence; from the stone heap, the line runs in a westerly direction to the road bed of the present no-line called Dark Entry road intersecting a stake and stones at the roadside and is bounded southerly by land formerly of John Krawczuk and George Godfroy, from the point in the road bed, the line runs in a northwesterly direction, following the road bed to the point in the road nearest to the beginning point and is bounded westerly on land formerly of Arthur James.

Being the same premises conveyed to Frank Szydlo, decedant, by deed dated July 24, 1912, and recorded in the office of the City of Warwick in Deed Book 83 at page 183 and a copy in West Warwick Record Book 13 at page 263.

We, Norman E. Gillespie and Nellie C. Gillespie husband and of the grantor wife

release to said grantee all our right of courtesy and all other interest in the aforedescribed premises.

dower.

Witness our hand this .......... 30th day of September.............. 19 72.

State of Rhode Island, Etc.
County of KENT

In West Warwick......on the......30th......day of......September......19..72 before me personally appeared.....Norman E. Gillespie and Nellie C. Gillespie

to me known and known by me to be the parties executing the foregoing instrument and.......they acknowledged said instrument, by them executed, to be their free act and deed.

REC'D W. WARWICK, R.I. OCT 19 1972 AT 8:40 O'CLOCK M.

BOOK 76 PAGE 210

Margaret C. Conlon
Town Clerk

710

76-711
ORIG LOT 28
PARCEL 2
ONLY

I, the undersigned, Norman Gillespie of the City of Warwick, County of Kent and State of Rhode Island, also known as Norman E. Gillespie

of ........................................................................................................

for consideration paid, grant to......Tri-Town Construction Co., Inc., a duly organized and existing Rhode Island Corporation, its principal place of business in the Town of South Kingston, Washington County of State of Rhode Island........................with QUIT-CLAIM COVENANTS

(Description, and Incumbrances, if Any)

Two (2) certain parcels of land located in the Town of West Warwick County of Kent and State of Rhode Island known and described as follows:

ONE: Lots numbered twenty-one (21), twenty-two (22), twenty-three (23) and twenty-six (26) on Assessors Plat No. 12, which plat is on record in the Tax Assessor's Office in the Town of West Warwick. Said parcel of land is bounded Northerly by the Green Bush Road, so-called, Easterly by land of Fritz Krantz, et ux and William Wicks, Southerly by land of Frank and Wilhemina Dubis and Westerly by land of Frank Szydlo and land of C. Henry Hawkinson, et al. Said land containing by estimate twenty-two and a half (22½) acres, be the same more or less. Being the same conveyed by deeds recorded in the Land Evidence Records of the Town of West Warwick in deed books 29 at page 573, deed book 34 at page 59 and deed book 28 at page 306.

TWO: A certain parcel of land known and described as lot numbered twenty-eight (28) on Assessor's Plat 12 in the Town of West Warwick which plat is recorded in the Tax Collector's Office in said Town of West Warwick. Said land is bounded Northerly by land of Albert Lussier, et al, Easterly by land of Frank Szydlo and by land of Anthony Perry, Southerly by land of John C. Carlson and Westerly by the West Warwick--Coventry Town Line. Being the same premises conveyed by deed recorded in deed book 25 at page 147 of the land Evidence Records of the Town of West Warwick.

I, the undersigned, Nellie C. Gillespie ................ .......... of the grantor
                                                                                        wife

release to said grantee all my right of ................ and all other interest in the aforedescribed premises.                                                dower

Witness our hand a ........this .......... 30 day of September.......... 19..72

State of Rhode Island, Etc.
County of  KENT

In West Warwick ............on the.... 30 .........day of September.............. 1972 before me personally appeared......Norman Gillespie and Nellie C. Gillespie

to me known and known by me to be the part..ies..executing the foregoing instrument and........ ..they..acknowledged said instrument by them executed, to be..their free act and deed.

REC'D W. WARWICK, R.I. OCT 19 1972 AT 4:55 O'CLOCK M.
BOOK 76 PAGE 711

Margaret C. Conlon
Town Clerk   711

711

77-1109

ORIG LOTS
1 & 32

PARTIALLY
IN E. GREENW

## WARRANTY DEED

JOHN G. CARLSON AND WIFE ELLEN G. CARLSON of the Town of West Warwick, County of Kent, State of Rhode Island, for consideration paid, grant to ROBERT PETRARCA and ROBERT HAGAN, both of the City of Warwick, County of Kent, State of Rhode Island, with WARRANTY COVENANTS.

PARCEL I: That certain tract or parcel of land located on the northerly side of Crompton Road, which said parcel contains approximately thirty (30) acres and is located partially in the Town of East Greenwich, Rhode Island, and partially in the Town of West Warwick, Rhode Island, and partially in the Town of Coventry, Rhode Island, the same being more specifically described as follows:

Beginning at a point in the northerly line of Crompton Road which said point is the southwesterly corner of the parcel herein described and the southeasterly corner of land now or lately of Norman Gillespie.; thence running northerly bounded westerly by said Gillespie land one thousand two hundred ninety-six and 32/100 (1,296.32) feet to an iron pin; thence turning an interior angle of 96° 16' 40" and running northeasterly bounded northerly by other land now or lately of Norman Gillespie five hundred sixty and 10/100 (560.10) feet to a stone bound; thence continuing to run in a northeasterly direction three hundred ninety-five and 17/100 (395.17) feet to an iron pin in a boulder at land now or lately of Anthony Perry; thence turning an interior angle of 81° 51' 37" and running southerly bounded easterly by said Perry land in part and by other land of these grantors in part one thousand three hundred ninety-one and 39/100 (1,391.39) feet to a granite bound located in the northerly line of said Crompton Road; thence turning an interior angle of 96° 37' 52" and running southwesterly bounded southerly by said Crompton Road three hundred fifty-four and 65/100 (354.85) feet to a point; thence turning an interior angle of 174° 45' 11" and running westerly two hundred fifty (250) feet to a point; thence turning an interior angle of 177° 23' 54" and running northwesterly three hundred twenty-four and 22/100 (324.22) feet to land now or lately of Norman Gillespie and the point and place of beginning.  This last described course and the first described course forming an interior angle of 92° 20' 26".

The southerly portion of the above described premises by its entire width fronting on Crompton Road to a depth of approximately seventy-five (75) feet is located in the Town of East Greenwich, Rhode Island; the extreme western portion from a width of approximately twenty (20) feet in the northwesterly corner, being triangular in shape, is located in the Town of Coventry, Rhode Island; the balance of the premises described herein are located in the Town of West Warwick, Rhode Island.

The above described premises are the same premises described and referred to in deed recorded at Deed Book 32 Page 139 of the Land Evidence Records of the Town of East Greenwich, Rhode Island, and in Deed Book 26 Page 197 of the Land Evidence Records of the Town of West Warwick, Rhode Island

1109

PARCEL II:  That certain tract or parcel of land located on
the northerly side of Crompton Road, which said parcel contains
2.00 acres and is located partially in the Town of East
Greenwich, Rhode Island, and partially in the Town of West
Warwick, Rhode Island, the same being more specifically
described as follows:

Beginning at a point in the northerly line of said Crompton
Road, which said point is the southeasterly corner of the
parcel herein described and the southwesterly corner of
land now or lately of George T. McGlynn Jr. and thence running
westerly bounded southerly by the northerly line of said
Crompton Road one hundred and 88/100 (100.88) feet to a
granite bound which said granite bound marks the southeasterly
corner of Parcel I described above; thence turning an interior
angle of 87° 43' 23" and running northerly bounded westerly
by other land of these grantors described as Parcel I above,
eight hundred sixty-four and 41/100 (864.41) feet to land
now or lately of Anthony Perry; thence turning an interior
angle of 92° 09' 13" and running easterly bounded northerly
by said Perry land one hundred and 87/100 (100.87) feet to
land now or lately of Jeffrey R. Hopkins et ux; thence
turning an interior angle of 87° 50' 47" and running southerly
bounded easterly in part by said Hopkins land and in part
by land now or lately of George T. McGlynn eight hundred
sixty-four and 19/100 (864.19) feet to the northerly line of
Crompton Road and the point and place of beginning.

The first described course and the last described course
form an interior angle of 92° 16' 37".

The southerly portion of the above described premises by its
entire width to a depth of approximately thirty-five (35)
feet is located in the Town of East Greenwich, Rhode Island;
the balance of the above described parcel is located in the
Town of West Warwick, Rhode Island.

The above described premises are the same premises described
and referred to in deed recorded in Deed Book 51 Page 458
of the Land Evidence Records of the Town of West Warwick,
Rhode Island and in Deed Book 37 Page 725 of the Land Evidence
Records of the Town of East Greenwich, Rhode Island.


The above parcels are conveyed subject to taxes assessed as
of December 31, 1972.
    John C. Carlson and wife Ellen G. Carlson release to said grantee
all our right of Curtesy and Dower and all other interest in the premises
WITNESS our hands this 21 day of April, A. D., 1973.

*John C. Carlson*
*Ellen G. Carlson*

1110

STATE OF RHODE ISLAND

COUNTY OF _Kent_

In _Warwick_ in said county on the _23rd_ day of _April_ A. D., 1973 before me personally appeared John C. Carlson and wife Ellen G. Carlson to me known and known by me to be the parties executing the foregoing instrument, and they acknowledged said instrument, by them executed to be their free act and deed.

RECD W. WARWICK, R. I. APR 24 1973 AT 10:30 O'CLOCK P M

BOOK _22_ PAGE _1102-1111_   Margaret C. Andon
Town Clerk

1111

## WARRANTY DEED

ROBERT HAGAN and wife ANNA HAGAN and ROBERT PETRARCA and wife NORMA PETRARCA, all of the City of Warwick, County of Kent, State of Rhode Island, for consideration paid, grant to TRI-TOWN CONSTRUCTION CO., INC. a Rhode Island corporation,

### with WARRANTY COVENANTS

PARCEL I:  That certain tract or parcel of land located on the northerly side of Crompton Road, which said parcel contains approximately thirty (30) acres and is located partially in the Town of East Greenwich, Rhode Island, and partially in the Town of West Warwick, Rhode Island, and partially in the Town of Coventry, Rhode Island, the same being more specifically described as follows:

Beginning at a point in the northerly line of Crompton Road which said point is the southwesterly corner of the parcel herein described and the southeasterly corner of land now or lately of Norman Gillespie; thence running northerly bounded westerly by said Gillespie land one thousand two hundred ninety-six and 32/100 (1,296.32) feet to an iron pin; thence turning an interior angle of 96° 16' 40" and running northerly easterly bounded northerly by other land now or lately of Norman Gillespie five hundred sixty and 10/100 (560.10) feet to a stone bound; thence continuing to run in a northeasterly direction three hundred ninety-five and 17/100 (395.17) feet to an iron pin in a boulder at land now or lately of Anthony Perry; thence turning an interior angle of 81° 51' 17" and running southerly bounded easterly by said Perry land in part and by other land of these grantors in part one thousand three hundred ninety-one and 39/100 (1,391.39) feet to a granite bound located in the northerly line of said Crompton Road; thence turning an interior angle of 96° 37' 52" and running southwesterly bounded southerly by said Crompton Road three hundred fifty-four and 85/100 (354.85) feet to a point; thence turning an interior angle of 174° 45' 11" and running westerly two hundred fifty (250) feet to a point; thence turning an interior angle of 177° 23' 54" and running northwesterly three hundred twenty-four and 22/100 (324.22) feet to land now or lately of Norman Gillespie and the point and place of beginning.  This last described course and the first described course forming an interior angle of 92° 20' 26".

The southerly portion of the above described premises by its entire width fronting on Crompton Road to a depth of approximately seventy-five (75) feet is located in the Town of East Greenwich, Rhode Island; the extreme western portion from a width of approximately twenty (20) feet in the northwesterly corner, being triangular in shape, is located in the Town of Coventry, Rhode Island; the balance of the premises described herein are located in the Town of West Warwick, Rhode Island.

88-53

ORIG LOT 1 &
32
PARCELS 1 & 11
DEED 247-355
PARTIALLY IN
E. GREENWICH

MAB
1/4/77   $55.00

MJB
1/4/77   $55.00

$55.00

53

63

The above described premises are the same premises described
and referred to in deed recorded at Deed Book 32 Page 139 of
the Land Evidence Records of the Town of East Greenwich,
Rhode Island, and in Deed Book 26 Page 197 of the Land
Evidence Records of the Town of West Warwick, Rhode Island.

PARCEL II:  That certain tract or parcel of land located on
the northerly side of Crompton Road, which said parcel con-
tains 2.00 acres and is located partially in the Town of
East Greenwich, Rhode Island, and partially in the Town of
West Warwick, Rhode Island, the same being more specifically
described as follows:

Beginning at a point in the northerly line of said Crompton
Road, which said point is the southeasterly corner of the
parcel herein described and the southwesterly corner of land
now or lately of George T. McGlynn, Jr. and thence running
westerly bounded southerly by the northerly line of said
Crompton Road one hundred and 88/100 (100.88) feet to a
granite bound which said granite bound marks the southeasterly
corner of Parcel I described above; thence turning an interior
angle of 87° 43' 23" and running northerly bounded westerly
by other land of John C. Carlson and wife Ellen G. Carlson
described as Parcel I above, eight hundred sixty-four and
41/100 (864.41) feet to land now or lately of Anthony Perry;
thence turning an interior angle of 92° 09' 13" and running
easterly bounded northerly by said Perry land one hundred and
87/100 (100.87) feet to land now or lately of Jeffrey R.
Hopkins et ux; thence turning an interior angle of 87° 50' 47"
and running southerly bounded easterly in part by said
Hopkins land and in part by land now or lately of George T.
McGlynn eight hundred sixty-four and 19/100 (864.19) feet to
the northerly line of Crompton Road and the point and place of
beginning.

The first described course and the last described course form
an interior angle of 92° 16' 37".

The southerly portion of the above described premises by its
entire width to a depth of approximately thirty-five (35) feet
is located in the Town of East Greenwich, Rhode Island; the
balance of the above described parcel is located in the Town
of West Warwick, Rhode Island.

The above described premises are the same premises described
and referred to in deed recorded at Deed Book 51 Page 458 of
the Land Evidence Records of the Town of West Warwick,
Rhode Island and in Deed Book 37 Page 725 of the Land Evidence
Records of the Town of East Greenwich, Rhode Island.

The above parcels are conveyed subject to taxes assessed as
of December 31, 1976.

    ROBERT HAGAN and wife ANNA HAGAN and ROBERT PETRARCA and
wife NORMA PETRARCA release to said grantee all our right of
Curtesy and Dower and all other interest in the premises
described herein.

* formerly

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed this *11th* day of *January* , A. D. 197*7*.

_____
Robert Hagan

_____
Anna Hagan

_____
Robert Petrarca

_____
Norma Petrarca

STATE OF RHODE ISLAND
COUNTY OF KENT

In *WARWICK* on the *11th* day of *January* A. D. 197*7*, before me personally appeared Robert Hagan and wife Anna Hagan and Robert Petrarca and wife Norma Petrarca, to me known and known by me to be the parties executing the foregoing instrument, and they acknowledged said instrument, by them executed, to be their free act and deed.

_____

_____

REC'D W. WARWICK R. JAN 11 1977 at 4:15 O'CLOCK
BOOK ___88___ PAGE 3353

Margaret C. Arduen
Town Clerk

55

247-355

4472

TRI-TOWN CONSTRUCTION CO., INC., a Rhode Island Corporation,

for consideration paid, grant to  TRI-TOWN ASSOCIATES, a Rhode Island General

Partnership,

with **WARRANTY COVENANTS**

GRANTEE'S ADDRESS IS:
c/o Lawrence C. LeBlanc
Unit B-4
24 Salt Pond Rd.
Wakefield, R.I.

Those certain tracts or parcels of land with all
buildings and improvements thereon, situated in
the Towns of West Warwick, Coventry and East Greenwich,
Rhode Island, which said real estate is more fully
described on EXHIBIT A attached hereto and incorporated
herein by reference.

Subject to encumbrances of record, which grantee assumes
and agrees to pay.

Subject to unpaid property taxes due and owing the Towns
of West Warwick, Coventry and East Greenwich, and any
applicable fire district taxes.

This Deed is executed in triplicate for recording in
the Towns of West Warwick, Coventry and East Greenwich,
Rhode Island.

NO STAMPS REQUIRED

**Witness** this        3rd        day of   September          , 19 87
said corporation has caused these Presents to be executed and its corporate seal to be hereunto affixed by its
Officer(s) duly authorized.

TRI-TOWN CONSTRUCTION CO., INC.

BY: _Edward Lawson President_
Edward R. Lawson, President

State of Rhode Island, Etc.
COUNTY OF PROVIDENCE

In  Providence    on the    3rd    day of   September      19 87,

before me personally appeared   EDWARD R. LAWSON, President

of    TRI-TOWN CONSTRUCTION CO., INC.,                    to me known and known by

me to be the part y   executing the foregoing instrument for and on behalf of said corporation, and   he

acknowledged said instrument, by him      executed, to be   his      free act and deed, in   his      said

capacit y     and the free act and deed of said corporation.

355   MICHAEL G. BRODY   Notary Public

EXHIBIT A

PARCEL I:  That certain tract or parcel of land located on
the northerly side of Crompton Road, which said parcel con-
tains approximately thirty (30) acres and is located partially
in the Town of East Greenwich, Rhode Island, and partially in
the Town of West Warwick, Rhode Island, and partially in the
Town of Coventry, Rhode Island, the same being more specif-
ically described as follows:

Beginning at a point in the northerly line of Crompton Road
which said point is the southwesterly corner of the parcel
herein described and the southeasterly corner of land now or
lately of Norman Gillespie;  thence running northerly bounded
westerly by said Gillespie land one thousand two hundred
ninety-six and 32/100 (1,296.32) feet to an iron pin;  thence
turning an interior angle of 96° 16' 40" and running north-
easterly bounded northerly by other land nor or lately of
Norman Gillespie five hundred sixty and 10/100 (560.10) feet
to a stone bound;  thence continuing to run in a northeasterly
direction three hundred ninety-five and 17/100 (395.17) feet
to an iron pin in a boulder at land now or lately of Anthony
Perry;  thence turning an interior angle of 81° 51' 37" and
running southerly bounded easterly by said Perry land in part
and by other land of these mortgagers in part one
thousand three hundred ninety-one and 39/100 (1,391.39) feet
to a granite bound located in the northerly line of said
Crompton Road;  thence turning an interior angle of 96° 37'
52" and running southwesterly bounded southerly by said
Crompton Road three hundred fifty-four and 85/100 (354.85)
feet to a point;  thence turning an interior angle of 174°
45' 11" and running westerly two hundred fifty (250) feet
to a point;  thence turning an interior angle of 177° 23' 54"
and running northwesterly three hundred twenty-four and
22/100 (924.22) feet to land now or lately of Norman Gillespie
and the point and place of beginning.  This last described
course and the first described course forming an interior
angle of 92° 20' 26".

The southerly portion of the above described premises by its
entire width fronting on Crompton Road to a depth of approxi-
mately seventy-five (75) feet is located in the Town of
East Greenwich, Rhode Island;  the extreme western portion
from a width of approximately twenty (20) feet in the north-
westerly corner, being triangular in shape, is located in the
Town of Coventry, Rhode Island;  the balance of the premises
described herein are located in the Town of West Warwick,
Rhode Island.

The above described premises are the same premises described
and referred to in deed recorded at Deed Book 32 Page 139
of the Land Evidence Records of the Town of East Greenwich,
Rhode Island, and in Deed Book 26 Page 197 of the Land
Evidence Records of the Town of West Warwick, Rhode Island.

356

EXHIBIT A - Page 1

~~Providence~~   on the   3rd   day of   September   19 87,

before me personally appeared   EDWARD R. LAWSON, President

of   TRI-TOWN CONSTRUCTION CO., INC.,   to me known and known by

me to be the part y   executing the foregoing instrument for and on behalf of said corporation, and   he

acknowledged said instrument, by   him   executed, to be   his   free act and deed, in   his   said

capacit y   and the free act and deed of said corporation.

355

MICHAEL J. BROPHY   Notary Public   Notary Public

PARCEL II:  That certain tract or parcel of land located on
the northerly side of Crompton Road, which said parcel con-
tains 2.00 acres and is located partially in the Town of
East Greenwich, Rhode Island, and partially in the Town of
West Warwick, Rhode Island, the same being more specifically
described as follows:

Beginning at a point in the northerly line of said Crompton
Road, which said point is the southeasterly corner of the
parcel herein described and the southwesterly corner of land
now or lately of George T. McGlynn, Jr. and thence running
westerly bounded southerly by the northerly line of said
Crompton Road one hundred and 88/100 (100.88) feet to a
granite bound which said granite bound marks the southeasterly
corner of Parcel I described above;  thence turning an inter-
ior angle of 87° 43' 23" and running northerly bounded westerly
by land formerly of Robert Hagan et als described as Parcel I above,
eight hundred sixty-four and 41/100 (864.41) feet to land now
or lately of Anthony Perry;  thence turning an interior angle
of 92° 09'. 13" and running easterly bounded northerly by
said Perry land one hundred and 87/100 (100.87) feet to land
now or lately of Jeffrey R. Hopkins et ux;  thence turning
an interior angle of 87° 50' 47" and running southerly
bounded easterly in part by said Hopkins land in part by land
now or lately of George T. McGlynn eight hundred sixty-four
and 19/100 (864.19) feet to the northerly line of Crompton
Road and the point and place of beginning.

The first described courses and the last described course form
an interior angle of 92° 16' 37".

The southerly portion of the above described premises by its
entire width to a depth of approximately thirty-five (35)
feet is located in the Town of East Greenwich, Rhode Island;
the balance of the above described parcel is located in the
Town of West Warwick, Rhode Island.

The above described premises are the same premises described
and referred to in deed recorded at Deed Book 51 Page 458 of
the Land Evidence Records of the Town of West Warwick, Rhode
Island and in Deed Book 37 Page 725 of the Land Evidence
Records of the Town of East Greenwich, Rhode Island

PARCEL III:

A certain wood-lot, situated in the southeasterly part of the Town
of West Warwick, on the Dark Entry Road, so-called, and is bounded
northerly by land now or formerly of Frank Szydlo; easterly by land
now or formerly of Frank and Wilhelmena Dubia; southerly by the said
Dubis land, formerly owned by Fones Shippee; and westerly by land now
or formerly of the Patrick Nolan Estate, and is said to contain twenty
acres, more or less.

EXHIBIT A – Page 2                    `357`

**··· ·v ·* *··* ······** ** *on the* *···· — day of September* 19 87,
before me personally appeared   EDWARD R. LAWSON, President

of    TRI-TOWN CONSTRUCTION CO., INC.,

                                                  to me known and known by
me to be the part y   executing the foregoing instrument for and on behalf of said corporation, and  he
acknowledged said instrument, by him      executed, to be  his      free act and deed, in   his      said
capacit y    and the free act and deed of said corporation.

355

PARCEL IV:

A certain parcel of land situated in the Town of West Warwick, County of Kent and State of Rhode Island, and bounded and described as follows:

A certain tract of land situated within the Town of West Warwick, R. I., beginning at the northwest corner thereof, thence following a stone wall and fence in an easterly direction to an angle in the wall where it turns to the north, bounded northerly by land now or formerly of Michael Dalton and Daniel Hawkinson; from said angle in the wall the line runs in a southerly direction nearly following the course of the brook to a stone heap near the brook and is bounded easterly by land formerly of Arnold and Angell but now of a Mrs. Lawrence; from the stone heap, the line runs in a westerly direction to the road bed of the present so-called Dark Entry road intersecting a stake and stones at the roadside and is bounded southerly by land formerly of John Krawczuk and George Godfrey; from the point in the road bed, the line runs in a northwesterly direction, following the road bed to the point in the road nearest to the beginning point and is bounded westerly on land formerly of Arthur James.

Being the same premises conveyed to Frank Szydlo, decedent, by deed dated July 24, 1912, and recorded in the office of the City of Warwick in Deed Book 83 at page 183 and a copy in West Warwick Record Book 13 at page 263.

← WEST WARWICK WAS STILL PART OF WARWICK IN 1912

PARCEL V:

A certain wood lot situated within the Town of West Warwick, R. I., and is bounded and described as follows to wit:

Beginning at the North East corner thereof following the line of wall southerly until it strikes the Middle of the so-called Dark entry Road following road bed of said Dark entry road, until it reaches the land of George Godfrey thence westerly bounded southerly on land of Geo Godfrey then turning an angle and running southerly to a large rock bounded easterly on land of Geo Godfrey. From said rock westerly to a stump and heap of stones bounded southerly on land of the heirs of Patrick Nolan from Stump and stones northerly to a stump with iron rod near a rock bounded westerly on the land now or formerly of Arthur James and formerly of Benjamin Wightman. This being the Coventry and West Warwick line from rod and stump easterly to the place of beginning bounded northerly on the land of Matthias Lussier, the same to contain about 20 acres, more or less.

358

EXHIBIT A - Page 3

in Providence on the 3rd day of September 19 87,

before me personally appeared EDWARD R. LAWSON, President

of TRI-TOWN CONSTRUCTION CO., INC., to me known and known by me to be the part y executing the foregoing instrument for and on behalf of said corporation, and he acknowledged said instrument, by him executed, to be his free act and deed, in his said capacit y and the free act and deed of said corporation.

355

Notary Public

PARCEL VI:

That certain tract or parcel of land situated in the Town of Coventry, Rhode Island, being otherwise identified as Lot 63 as shown on Assessor's Plat 9 for tax year 1987. Said premises being the same premises conveyed to Tri-Town Construction Co., Inc., by Deed from Norman E. Gillespie recorded in the Land Evidence Records of the Town of Coventry in Book 93, Page 1021, to which said Deed and the references therein contained reference is hereby had and made, and made a part hereof for a particular description of said hereby conveyed premises.

PARCEL VII:

That certain tract or parcel of land situated in the Town of Coventry, Rhode Island, being otherwise identified as Lot 64 as shown on Assessor's Plat 9 for tax year 1987. Said premises being the same premises conveyed to Tri-Town Construction Co., Inc. by Deed from Norman E. Gillespie recorded in the Land Evidence Records of the Town of Coventry in Book 93, Page 1022, to which said Deed and the references therein contained reference is hereby had and made, and made a part hereof for a particular description of said hereby conveyed premises.

OCT 7 - 1987

REC'D @ COVENTRY, R.I. _____ AT 1:00 O'CLOCK P M

BOOK 847 PAGE 355-359

*Anna E. Quarts*

359

At *Providence* on the *3rd* day of *September* 19 87, before me personally appeared EDWARD R. LAWSON, President

of TRI-TOWN CONSTRUCTION CO., INC., to me known and known by me to be the part y executing the foregoing instrument for and on behalf of said corporation, and he acknowledged said instrument, by him executed, to be his free act and deed, in his said capacit y and the free act and deed of said corporation.

355   *Michael J Brady*

MICHAEL J. BRADY   Notary Public   *Notary Public*



354-233
OUT PARCEL

6430

## WARRANTY DEED

TRI-TOWN ASSOCIATES, a Rhode Island General Partnership, with offices in the Town of South Kingstown, State of Rhode Island for consideration paid, grants to KENT COUNTY WATER AUTHORITY, a corporation duly created by the General Assembly of the State of Rhode Island, its successors and agents, with WARRANTY COVENANTS:

That certain tract or parcel of land located northerly of Crompton Road, West Warwick, Rhode Island which said tract or parcel of land is more specifically described on EXHIBIT A hereof and shown as shaded area on EXHIBIT B hereof, said EXHIBIT A and EXHIBIT B being attached hereto and incorporated herein by reference.

Grantor and Grantee affirm and acknowledge that the access of Grantee from Crompton Road to the tract or parcel of land conveyed by this Warranty Deed is by way of RIGHT OF WAY EASEMENT DEED of even date and by no other.

Subject to taxes assessed as of December 31, 1988.

*No Stamps Required*

IN WITNESS WHEREOF, TRI-TOWN ASSOCIATES has caused this Deed to be executed by its General Partner duly authorized this _13TH_ day of _SEPTEMBER_, 1989.

TRI-TOWN ASSOCIATES

By: _____

STATE OF RHODE ISLAND

COUNTY OF PROVIDENCE

In PROVIDENCE on the 13TH day of SEPTEMBER, A.D., 1989, before me personally appeared PAUL PLOURDE to me known and known by me to be the General Partner of TRI-TOWN ASSOCIATES, a Rhode Island General Partnership, and HE acknowledged said execution of this Deed to be HIS free act and deed in HIS said capacity and the free act and deed of TRI-TOWN ASSOCIATES.

_____
MARY G. MARSELLA
MY COMMISSION EXPIRES: 6/30/91

PETRARCA & McGAIR
Attorneys at Law
797 Bald Hill Road
P. O. Box 1340
West Warwick, R. I. 02893

That certain parcel of land situated on the northerly side of Crompton Road, in the Town of West Warwick, State of Rhode Island bounded and described as follows;

Beginning at a point in the northeasterly corner of an easement said corner also being a point on the easterly line of the hereinafter described parcel; thence running in a general northerly direction a distance of (79.82') feet to a point; thence turning an interior angle of $90^0$-00'-00" and running in a general westerly direction a distance of (100.00') feet to a point; thence turning an interior angle of $90^0$-00'-00" and running in a general southerly direction a distance of (110.00') feet to a point; thence turning an interior angel of $78^0$-41'-24" and running in a general northeasterly direction a distance of (101.98') feet to a point; thence turning an interior angle of $101^0$-18'-36" and running in a general northerly direction a distance of (10.18') feet to the point and place of beginning. Said last five courses being bounded easterly, northerly, westerly, southeasterly and easterly by other land now or formerly belonging to this grantor. Said last course forms an interior angle of $180^0$-00'-00" with the first described course.

Said parcel contains 10,000 square feet.

EXHIBIT A

234



North Point

PROPOSED SUBDIVISION
NOTTINGHAM ESTATES
LOT 73

LOT 74

100.00'

N/F TRI TOWN ASSOCIATES

Town of West Warwick

Town of Coventry

AREA = 10,000 Sq. Ft.

LOT 75

101° 18' 36"

Water
Line
Easement

26.75

78° 41' 24"

101.98'

PROPOSED SUBDIVISION
NOTTINGHAM ESTATES
LOT 76

Plan Of Land For
**TRI TOWN ASSOCIATES**
Located In
West Warwick, R. I.
Scale 1" = 20'    June 1, 1989
BY: AERIAL TOPO SURVEY

KIRK D.
No. 1684
4/1/89
REGISTERED
LAND SURVEYOR

DEC 27 1989
REC'D W. WARWICK R.I.    AT 2:10 O'CLOCK P.M
BOOK 354 PAGE 233-235

EXHIBIT B
235

Jan. 16 '91 14:14 8088  ARMSTRONG GIBBONS                    TEL 751-4124        PAGE 18/11

da/agreements
quitclaim

399-205

OUT PARCEL

## QUITCLAIM DEED

Tri-Town Associates, a Rhode Island General Partnership, with an office in South Kingstown, Rhode Island, for consideration paid, grants to Profile Construction Company, Inc. a Rhode Island Corporation with an office in West Warwick, Rhode Island,

with QUIT-CLAIM COVENANTS:

That certain lot or parcel of land with all buildings and improvements thereon, located in the Town of West Warwick, County of Kent, and State of Rhode Island, as more particularly described on Exhibit A attached hereto and made a part hereof.

WITNESS its hands this ___16___ day of January, 1991.

Tri-Town Associates

By: _____
General Partner

STATE OF RHODE ISLAND
COUNTY OF KENT

In ___WARWICK___, on the 16th day of January, 1991, before me personally appeared LEONARD A. TERRIN being a General Partner of Tri-Town Associates, to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him executed to be his free act and deed, in his said capacity, and the free act and deed of said Partnership.

_____
Notary Public
My Commission Expires: 6/30/91
MARY C. MARSELLA

205

EXHIBIT A

I.    That  certain parcel of land situated on the  southerly
side of   Drawbridge   Drive in the Town of West Warwick, State  of
Rhode Island, bounded and described as follows:

Beginning  at  a point in the southerly line  of  Drawbridge
Drive  said point being the southwesterly end of Drawbridge Drive
and the northwesterly corner of the hereinafter described parcel;
thence  running in a general easterly direction bounded northerly
by Drawbridge  Drive  a  distance of (582.59') feet to  a  point;
thence  turning an interior angle of 90°-42'-54" and running in a
general   southerly   direction  bounded easterly by land now  or
formerly belonging to this grantor a distance of (19.22') feet to
a point;  thence  turning  an interior angle of  90°-00'-00"  and
running in a general westerly direction bounded southerly by land
now or  formerly belonging to Profile Construction a distance  of
(583.38')  feet  to a point; thence turning an interior angle  of
88°-12'-07"  and running in a general northerly direction bounded
westerly  by  land  now or formerly belonging to this  grantor  a
distance  of  (26.50') feet to the point and place of  beginning.
Said last described course forms an interior angle of 91°-04'-59"
with the first described course.

JAN 25 1991 /10:50
REC'D W. WARWICK R.I.____AT____O'CLOCK A M
BOOK 394  PAGE 205-206

206

398-253

### WARRANTY DEED

Tri-Town Associates, a Rhode Island General Partnership, with an office at Unit F-1, 24 Salt Pond Road, Wakefield, Rhode Island, for consideration paid by G. M. Homes of R.I., Inc., including the obligation of G. M. Homes of R.I., Inc. to cooperate with Tri-Town Associates in the request by Tri-Town Associates if any, to the Town of Coventry, for approval to build, construct or otherwise develop any housing development, hereby grants to G. M. Homes of R.I., Inc., a Rhode Island Corporation, with an office at Timothy Drive, Westerly, Rhode Island, with WARRANTY COVENANTS:

Those certain parcels of real estate, with all buildings and improvements thereon, situated in the Town of West Warwick, County of Kent, and State of Rhode Island, as more particularly described in Exhibit A attached hereto and made a part hereof.

Subject to taxes assessed December 31, 1990.

Subject to restrictions, easements and rights-of-way of record, if any

Subject to an easement of record to Kent County Water Authority.

Subject to a prior mortgage of record to the Bank of New England-Old Colony, N.A.

IN WITNESS WHEREOF, Tri-Town Associates, by its duly authorized General Partner, has hereunto caused this instrument to be executed this _16TH_ day of _____, 1991.

_11,200.00_
_1-17-91_
_Dmn - DL_

Tri-Town Associates

By: _____
General Partner

STATE OF RHODE ISLAND
COUNTY OF KENT

In _Warwick_, on the _16TH_ day of _____, 1991, before me personally appeared _____ being the authorized General Partner of Tri-Town Associates, to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument, by him executed, to be his free act and deed, in his said capacity, and the free act and deed of said Partnership.

_____
Notary Public
My Commission Expires: 6/30/91
MARY E. MARSELLA

ACCEPTED:
G. M. Homes of R.I., Inc.

By: _____

Timothy Drive
Westerly, RI 02891

253

SCHEDULE A

That certain parcel of land situated on the northerly side of Crompton Road located in the Town of West Warwick, State of Rhode Island, bounded and described as follows.

Beginning at a point in the northerly sideline of Crompton Road, said point being the southwesterly corner of land now or formerly belonging to Profile Construction and the southeasterly corner of land now or formerly belonging to this grantor; thence running in a general northerly direction bounded easterly by said Profile Construction land a distance of (44.72') feet to the point and place of beginning, said point also being on the division line between the Town of East Greenwich and the Town of West Warwick; thence continuing in a general northerly direction a distance of (85.28') feet to a point; thence turning an interior angle of 256°-29'-43" and running in a general northeasterly direction a distance of (213.44') feet to a point; said last two courses being bounded easterly and southeasterly by said Profile Construction land; thence turning an interior angle of 105°-54'-13" and running in a general northerly direction a distance of (683.27') feet to a point; thence turning an interior angle of 268°-23'-56" and running in a general easterly direction a distance of (154.00') feet to a point; said last two courses being bounded easterly and southerly by land now or formerly belonging to John and Janice Sauco; thence turning an interior angle of 90°-00'-00" and running in a general northerly direction a distance of (465.00') feet to a point; thence turning an interior angle of 270°-00'-00" and running in a general easterly direction a distance of (45.00') feet to a point; thence turning an interior angle of 100°-31'-11" and running in a general northerly direction a distance of (46.00') feet to a point; thence turning an interior angle of 184°-21'-21" and continuing in a general northerly direction a distance of (303.90') feet to a point; thence turning an interior angle of 109°-08'-59" and running in a general northwesterly direction a distance of (51.00') feet to a point on a curve; thence turning and running in a general northerly direction along the arc of a curve having a radius of (50.00') feet an arc distance of (37.28') feet to a point; thence turning and running in a general easterly direction a distance of (76.28') feet to a point; thence turning an interior angle of 127°-17'-52" and running in a general northeasterly direction a distance of (103.00') feet to a point; said last eight courses being bounded easterly, southerly, easterly, easterly, northeasterly, easterly, southerly and southeasterly by land now or formerly belonging to this grantor; thence turning an interior angle of 60°-14'-51" and running in a general westerly direction bounded northerly in part by land now or formerly belonging to Michael A. and Robin J. Stanczyk, in part by land now or formerly belonging to Richard J. and Jennifer Rita and in part by land now or formerly belonging to Harry J. and Cynthia Fontaine a distance of (305.88') feet to a point in the easterly sideline of Drawbridge Drive; thence turning an interior angle of 93°-21'-56" and running in a general southerly direction along the easterly sideline of said Drawbridge Drive a distance of (12.12') feet to a point; thence turning an interior angle of 270°-00'-00" and running in a

1

254

general westerly direction bounded northerly in part by said Drawbridge Drive, in part by land now or formerly belonging to Joseph Conte III, in part by land now or formerly belonging to Thomas J. and Sharon A. Lane and in part by Longbow Drive a distance of (280.00') feet to a point; thence turning an interior angle of 270°-00'-00" and running in a general northerly direction along the westerly sideline of said Longbow Drive a distance of (21.23') feet to a point; thence turning an interior angle of 90°-00'-00" and running in a general westerly direction bounded northerly in part by land now or formerly belonging to Dale R. and Lynne A. Smith and in part by land now or formerly belonging to David A. and Barbara A. Zaborski a distance of (182.27') feet to a point; thence turning an interior angle of 250°-47'-42" and running in a general northwesterly direction bounded northeasterly by said Zaborski land a distance of (147.02') feet to a point in the southerly sideline of Quiver Drive; thence turning an interior angle of 90°-00'-00" and running in a general southwesterly direction along the southerly sideline of said Quiver Drive a distance of (50.12') feet to a point; thence turning an interior angle of 270°-00'-00" and running in a general northwesterly direction bounded northeasterly in part by said Quiver Drive and in part by land now or formerly belonging to David A. Bordeleau II a distance of (143.00') feet to a point; thence turning an interior angle of 90°-00'-00" and running in a general southwesterly direction bounded northwesterly in part by land now or formerly belonging to Howard Mathewson, in part by land now or formerly belonging to Mark D. McMullen, in part by land now or formerly belonging to Joseph M. Danielle, in part by land now or formerly belonging to Kenneth P. Kuncio, in part by Service Road, and in part by land now or formerly belonging to Robert A. Lemoi a distance of (530.78') feet to a point in the division line between the Town of West Warwick and the Town of Coventry; thence turning an interior angle of 107°-59'-24" and running in a general southerly direction along said division line bounded westerly by other land of this grantor a distance of (1834.20') feet to a point; thence turning an interior angle of 88°-12'-07" and running in a general easterly direction a distance of (583.38') feet to a point; thence turning an interior angle of 270°-00'-00" and running in a general southerly direction a distance of (82.28') feet to a point; said last two courses being bounded southerly and westerly by land now or formerly belonging to Profile Construction a distance of (82.82') feet to a point; thence turning an interior angle of 90°-42'-54" and running in a general easterly direction bounded southerly by other land of this grantor a distance of (240.02') feet to the point and place of beginning. Said last described course forms an interior angle of 89°-17'-06" with the first described course.

Said parcel contains 49.46 acres, *more or less* {

2

255

EXCLUDING, HOWEVER, from the above described parcel,

I.   That certain parcel of land situated on the southerly side of Drawbridge Drive in the Town of West Warwick, State of Rhode Island, bounded and described as follows:

Beginning at a point in the southerly line of Drawbridge Drive said point being the southwesterly end of Drawbridge Drive and the northwesterly corner of the hereinafter described parcel; thence running in a general easterly direction bounded northerly by Drawbridge Drive a distance of (582.59') feet to a point; thence turning an interior angle of 90°-42'-54" and running in a general southerly direction bounded easterly by land now or formerly belonging to this grantor a distance of (19.22') feet to a point; thence turning an interior angle of 90°-00'-00" and running in a general westerly direction bounded southerly by land now or formerly belonging to Profile Construction a distance of (583.38') feet to a point; thence turning an interior angle of 88°-12'-07" and running in a general northerly direction bounded westerly by land now or formerly belonging to this grantor a distance of (26.50') feet to the point and place of beginning. Said last described course forms an interior angle of 91°-04'-59" with the first described course.

Said parcel contains 13,324 square feet.

II.   That certain parcel of land situated on the northerly side of Crompton Road, in the Town of West Warwick, State of Rhode Island, bounded and described as follows:

Beginning at a point in the northeasterly corner of an easement said corner also being a point on the easterly line of the hereinafter described parcel; thence running in a general northerly direction a distance of (79.82') feet to a point; thence turning an interior angle of 90°-00'-00" and running in a general westerly direction a distance of (100.00') feet to a point; thence turning an interior angle of 90°-00'-00" and running in a general southerly direction a distance of (110.00') feet to a point; thence turning an interior angle of 78°-41'-24" and running in a general northeasterly direction a distance of (101.98') feet to a point; thence turning an interior angle of 101°-18'-36" and running in a general northerly direction a distance of (10.18') feet to the point and place of beginning. Said last five courses being bounded easterly, northerly, westerly, southeasterly and easterly by other land now or formerly belonging to this grantor. Said last course forms an interior angle of 180°-00'-00" with the first described course.

Said parcel contains 10,000 square feet.

REC'D W. WARWICK, R.I. JAN 17 1991 2:01 O'CLOCK P.M

BOOK 398   PAGE 253-256

3

256

3418

G.M. HOMES OF R.I., INC., a Rhode Island corporation,
for consideration paid grant to Scott T. Carlone and
Joan M.Carlone, As Tenants by the Entirety

with Warranty Covenants

That certain tract or parcel of land with all the buildings and
improvements thereon, laid out and designated as Lot No. 144
( One forty four ) on that plat entitled, "FINAL FOR
NOTTINGHAM ESTATES SECTION NO. 4 Situated in West Warwick, Rhode
Island (A.P.12 Lots 1, 27, 28, 31, & 32) OWNER/DEVELOPER TRI-TOWN
ASSOCIATES BY: KIRK D. ANDREWS Registered Land Surveyor", which
plat is recorded in the Land Evidence Records in the Town of West
Warwick in Plat Book 3 at pages 53, 54, and 55.

Subject to easements and set back lines of record.

Subject to any present or future sewer assessments of record.

Witness this 19 day of July , 1991, said corporation
has caused these Presents to be executed and its corporate seal
to be hereunto affixed by its Officer's) duly authorized.

G.M. HOMES OF R.I., INC.
BY:
JOSEPH GUASTAMACHIO
ITS: President

STATE OF RHODE ISLAND
COUNTY OF

In Westwarwickon the 19 day of July , 1991, before
me personally appeared JOSEPH GUASTAMACHIO, President of G.M.
HOMES OF R.I., INC., to me known and known by me to be the part
executing the foregoing instrument, and he acknowledged said
instrument, by him executed, to be his free act and deed, in his
said capacity and the free act and deed of said corporation.

NOTARY PUBLIC
My Commission Expires: June 30,1991

Grantees address:

1 Arrow Court

WEST Warwick, R.I.02893

L/nottdeed

JUL 22 1991 10:53 O'CLOCK AM
REC'D W. WARWICK, RI AT
BOOK 420 PAGE 197

TAX $ 253.10
DATE 7-22-91
RECP'T

001443

REAL ESTATE CONVEYANCE TAX

197

# QUITCLAIM DEED

**JOAN M. CARLONE** of the Town of West Warwick, State of Rhode Island AND **SCOTT T. CARLONE,** of the Town of Coventry, State of Rhode Island

For no consideration paid, grant to: **JOAN M. CARLONE** of the Town of West Warwick, State of Rhode Island

As Sole Owner

*See attached Exhibit "A"*

THE GRANTORS NAMED HEREIN DO HEREBY COVENANT THAT THIS TRANSFER IS SUCH THAT NO R.I.G.L. SECTION 44-30-71.3 WITHHOLDING IS REQUIRED. THIS IS NOT A SALE.

SUBJECT TO TAXES ASSESSED DECEMBER 31, 2012.

NO DOCUMENTARY STAMPS ARE REQUIRED, AS THIS IS NOT A SALE.

SUBJECT TO ENCUMBRANCE OF RECORD.

JOAN M. CARLONE

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick, in said County, on the 20th day of August, 2013, before me personally appeared **JOAN M. CARLONE,** to me known and known by me, to be the party executing the foregoing instrument, and she acknowledged said instrument, by her executed, to be her free act and deed.

Notary Public *Patricia A. Sullivan*
My Commission Expires: 8/01/2017

Received in West Warwick R.I.
Date Aus 26,2013 Time 11:48A
Paula Iannitelli, Deputy Town Clerk
INST: 00004297
Bk: 2263 Ps: 113

**SCOTT T. CARLONE**

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick, in said County, on the 20th day of August, 2013, before me personally appeared **SCOTT T. CARLONE**, to me known and known by me, to be the party executing the foregoing instrument, and he acknowledged said instrument, by his executed, to be his free act and deed.

Notary Public
My Commission Expires: _6/20/17_

*Prepared by:*
**PATRICIA A. SULLIVAN, ESQUIRE**
300 Centerville Road
Summit West-Suite 300
Warwick, Rhode Island 02886
(401)732.8300

*Property Address:*
3 Arrow Court
West Warwick, Rhode Island 02893

*Return to:*
Joan Carlone
3 Arrow Court
West Warwick, Rhode Island 02893

Doc # 00004297
BOOK 2263 PAGE 114

## EXHIBIT A

That certain tract or parcel of land with all the buildings and improvements thereon, laid out and designated as Lot No. 144 (one hundred forty four) on that plant entitled, "FINAL FOR NOTTINGHAM ESTATES SECTION NO. 4 situated in West Warwick, Rhode Island (A.P. 12 Lots 1, 27, 28, 31, & 32) OWNER/DEVELOPER TRI-TOWN ASSOCIATES BY: KIRK D. ANDREWS Registered Land Surveyor", which plat is recorded in the Land Evidence Records in the Town of West Warwick in Plat Book 3 at pages 53, 54, and 55.

Subject to easements and set back lines of record.

Subject to any present or future sewer assessments of record.

Doc # 00004297
BOOK 2263 PAGE 115

# Exhibit C

MIN: ████████

# ADJUSTABLE RATE BALLOON NOTE
### 3 Year Rate Lock
### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

| December 13, 2006 | WEST WARWICK | Rhode Island |
|---|---|---|
| [Date] | [City] | [State] |

**3 ARROW COURT, WEST WARWICK, RI 02893**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ **216,000.00**          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is   **New Century Mortgage Corporation**

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.250**  %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the first day of each month beginning on          **February 1, 2007**
My monthly payments will be based on an assumed **40**-year amortization period (the "Amortization Period").

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  **01/01/2037**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **18400 Von Karman, Suite 1000, Irvine, CA 92612**

or at a different place if required by Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ **1,542.54**   . This amount may change.

### (C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

NCMC
Adjustable Rate Balloon Note (Multi)                    Page 1 of 4                              Initials
RE-527 (011806)

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **January, 2010**, and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Charges

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six And Seven Tenth(s)** percentage points (**6.700%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0. 125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment. Notwithstanding the Amortization Period applicable to this Note, the entire unpaid principal amount will be fully due and payable on the Maturity Date.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **10.250%** or less than **8.250%**. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One And One-half** percentage point(s) (**1.500%**) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **15.250%**.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Initials 

**Transfer of the Property or a Beneficial Interest in Borrower**. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
SCOTT T CARLONE                    -Borrower

_____ (Seal)
JOAN M CARLONE                     -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

[Sign Original Only]

Pay to the order of, without recourse

New Century Mortgage Corporation

By: _____

Steve Nagy
V.P. Records Management

# Exhibit D

Return To:

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

```
Received in West Warwick R.I.
Date Dec 18,2006 Time 02:41:38P
David D. Clayton, Town Clerk
INST=   00008945
Bk=   1819   Pg=       31
```

Prepared By:

New Century Mortgage Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

———————————[Space Above This Line For Recording Data]———————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  December 13, 2006
together with all Riders to this document.
**(B) "Borrower"** is SCOTT T CARLONE and JOAN M CARLONE

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel (888) 679-MERS.

RHODE ISLAND - Single Family - **Fannie Mae/Freddie Mac**
UNIFORM INSTRUMENT WITH MERS

Form 3040  1/01 (rev. 11/02)

VMP ®-6A(RI) (0509)
®
Page 1 of 15                Initials:
           VMP Mortgage Solutions, Inc

**(D) "Lender"** is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California
Lender's address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

**(E) "Note"** means the promissory note signed by Borrower and dated December 13, 2006
The Note states that Borrower owes Lender TWO HUNDRED SIXTEEN THOUSAND AND 00/100
Dollars
(U.S. $216,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than 01/01/2037                    .

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

Prepayment Rider, ARM Rider Addendum

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used



Initials



Form 3040  1/01 (rev. 11/02)

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS, (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the
    City/Town            of          WEST WARWICK            :
        [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
See Legal Description Attached Hereto and Made a Part Hereof

Parcel ID Number: PLAT 12 LOT 744                      which currently has the address of
3 ARROW COURT                                                          [Street]
WEST WARWICK                              [City], Rhode Island 02893          [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

Initials

-6A(RI) (0509)                    Page 3 of 15                    Form 3040  1/01 (rev. 11/02)

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: _____

-6A(RI) (0509)     Page 5 of 15     Form 3040  1/01 (rev. 11/02)

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Bk: 1819 Pg: 39

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.



Initials:

-6A(RI) (0509)    Page 9 of 15    Form 3040    1/01 (rev. 11/02)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials:

-6A(RI) (0509)          Page 10 of 15          Form 3040  1/01 (rev. 11/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Bk: 1819 Pg: 43

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Outstanding Automatic Orders in Domestic Relations Cases.** Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

**25. Homestead Estate.** If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.

Bk: 1819 Pg: 44

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
SCOTT T CARLONE                         -Borrower

_____

_____ (Seal)
JOAN M CARLONE                          -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                               -Borrower

_____ (Seal)          _____ (Seal)
                       -Borrower                               -Borrower

**STATE OF RHODE ISLAND,** Kent County ss:

On this 13th day of December, 2006, in Warwick
in said County, before me personally appeared

Scott T. Carlone and Joan M. Carlone

each and all to me known and known to me to be the person(s) executing the foregoing instrument and
acknowledged said execution to be his/her/their free act and deed.

_____
Notary Public

JASON R. MARINELLI
NOTARY PUBLIC
STATE OF RHODE ISLAND
MY COMMISSION EXPIRES OCT. 25, 2009

-6A(RI) (0509)          Page 15 of 15          Initials: ___          Form 3040          1/01 (rev. 11/02)

## EXHIBIT "A"

That certain tract or parcel of land with all the buildings and improvements thereon, laid out and designated as Lot No. 144 (One forty four) on that Plat entitled, "FINAL FOR NOTTINGHAM ESTATES SECTION NO. 4 Situated in West Warwick, Rhode Island (A.P. 12 Lots 1, 27, 28, 31, & 32) OWNER/DEVELOPER TRI-TOWN ASSOCIATES BY: KIRK D. ANDREWS Registered Land Surveyor", which plat is recorded in the Land Evidence Records in the Town of West Warwick in Plat Book 3 at pages 53, 54, and 55.

Subject to easements and set back lines of record.

Subject to any present or future sewer assessments of record.

Bk: 1819 Ps: 47

# ADJUSTABLE RATE RIDER
MIN: ███████████

**(LIBOR Six-Month Index (As Published In** *The Wall Street Journal***) - Rate Caps)**
THIS ADJUSTABLE RATE RIDER is made this 13th day of December, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
New Century Mortgage Corporation

("Lender") of the same date and covering the property described in the Security Instrument and located at:  3 ARROW COURT, WEST WARWICK, RI  02893

(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.**

**ADDITIONAL COVENANTS**. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 8.250 %. The unpaid principal of the Note is being amortized over an assumed 40 -year period (the "Amortization Period"). The unpaid principal of the Note is fully due and payable on the maturity date of the Note. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The interest rate I will pay may change on the first day of January, 2010 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

NCMC
Six Month LIBOR
Multi-state Balloon Adjustable Rate Rider
RE- 560 (101906)                    Page 1 of 3                    Initials ███████

Bk: 1819 Pg: 48

**(B)   The Index**

Beginning with the first Change Date, my interest rate will be based on an Index.  The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.  The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

**(C)   Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six And Seven Tenth(s)**    percentage points  ( **6.700 %**) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe on the Change Date in full over the remaining Amortization Period at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.  Notwithstanding the Amortization Period applicable to this Note, the entire unpaid principal amount will be fully due and payable on the Maturity Date.

**(D)   Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.250** % or less than **8.250** %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **One And One-half** percentage points (**1.500 %**) from the rate of interest I have been paying for the preceding 6 months.  My interest rate will never be greater than **15.250 %**.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change.   The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower**.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by

NCMC
Six Month LIBOR
Multi-state Balloon Adjustable Rate Rider
RE- 560 (101906)                    Page 2 of 3                    Initials

Bk: 1819 Pg: 49

Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
SCOTT T CARLONE          -Borrower

_____ (Seal)
JOAN M CARLONE           -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

NCMC
Six Month LIBOR
Multi-state Balloon Adjustable Rate Rider          Page 3 of 3
RE- 560 (101906)

Initials 

MIN: ███████████

# ADJUSTABLE RATE RIDER ADDENDUM
### (Libor Index - Rate Caps)

This Adjustable Rate Rider Addendum is made this **13th** day of **December 2006** ,
and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") and Adjustable Rate Rider (the
"Rider") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's
Note to

**New Century Mortgage Corporation**                                    (the "Lender").

Property securing repayment of the Note is described in the Security Instrument and located at:

**3 ARROW COURT, WEST WARWICK, RI 02893**
(Property Address)

To the extent that the provisions of this Adjustable Rate Rider Addendum are inconsistent with the
provisions of the Note and/or Security Instrument and/or Rider, the provisions of this Addendum shall
prevail over and supersede any such inconsistent provisions of the Note and/or Security Instrument and/or
Rider.

In addition to the covenants and agreements made in the Note, Security Instrument, and Rider, Borrower and
Lender further covenant and agree as follows:

4.     **(D) LIMITS ON INTEREST RATE CHANGES**
        The interest rate I am required to pay at the first change date will not be greater than
         **10.250**% or less than            **8.250**%. Thereafter, my interest rate
will never be increased or decreased on any single Change Date by more than
**One And One-half** percentage point(s) (            **1.500**%) from
the rate of interest I have been paying for the preceding   **6**   months. My interest rate will never be
greater than            **15.250**% or less than            **8.250**%.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Adjustable Rate Rider Addendum.

_____          _____
**SCOTT T CARLONE**                         **JOAN M CARLONE**

_____          _____

_____          _____

NCMC
Adjustable Rate Rider Addendum
RE-102    (082296)                  Page 1 of 1

BK: 1819 Pg: 51

MIN: █████████

# PREPAYMENT RIDER
## ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **13th** day of **December     2006** , and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation** (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

## 5.  BORROWER RIGHT TO PREPAY

**I have the right to make payments of principal any time before they are due. A prepayment of all of the unpaid principal is known as a "full prepayment". A prepayment of only part of the unpaid principal is known as a "partial prepayment".**

**Except as provided below, I may make a full or partial prepayment at any time. If I make a partial prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other partial prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a full prepayment at any time. However, if within the first 12 MONTHS after the execution of the Security Instrument, I make any prepayment(s), the total amount of which exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to two percent (2%) of the balance due on the loan.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____          _____
SCOTT T CARLONE                          JOAN M CARLONE


_____          _____


_____          _____


NCMC
Prepay Rider - ARM (RI)
RE-328    (080106)                    Page 1 of 1

Loan #

When Recorded Mail to:
Nicholas Barrett
999 South Broadway
East Providence, RI 02914

Received in West Warwick R.I.
Date Oct 24,2008 Time 03:21:43P
Deborah A. Tellier, Town Clerk
INST:    00005269
Bk =    1971    Pg =        43

_____(space above this line for recording Date)_____

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to Deutsche Bank
National Trust Company, As Trustee For Morgan Stanley, MSAC 2007-NC3 c/o Saxon Mortgage
Services, Inc., 4708 Mercantile Drive North, Forth Worth, TX 76137, its Successors and Assigns, all
beneficial interest under that certain Mortgage dated December 13, 2006 executed by SCOTT T.
CARLONE and JOAN M. CARLONE, Mortgagors, and recorded on December 18, 2006 in the
Records of Land Evidence of the Town of West Warwick, State of Rhode Island, in Book 1819 at
Page 31, describing land therein as:

Commonly known as:        3 Arrow Court, West Warwick, RI 02893
                          Assessors Plat: 12 Lot: 744

Together with the note or notes therein described or referred to, the money due and to become due
thereon with interest and all rights accrued or to accrue under said mortgage.

MERS, Inc., as Nominee for New Century Mortgage
Corporation

BY:_____

Name:___Bethany Hood_____

Title:_____✓ ?_____

State of  MN
County of  Dalcote

On  Oct. 22  , 2008, before me, personally appeared __Bethany Hood_____,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s)
whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on
the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the
instrument.

Witness my hand and official seal.

(this area for official seal)

Notary Public
Name___Shoua Moua_____
Notary Public in for said State
My Commission expires:__1/31/12___

SHOUA MOUA
NOTARY PUBLIC · MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2012

Loan # ███████

When Recorded Mail to:
Nicholas Barrett
999 South Broadway
East Providence, RI 02914

Received in West Warwick R.I.
Date Sep 14,2009 Time 03:33:42P
Deborah A. Tellier, Town Clerk
INST# 00004670
Bk# 2022   Pg# 269

_____(space above this line for recording Date)_____

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to Deutsche Bank National Trust Company, as Trustee for Morgan Stanley ABS Capital I Inc. Trust 2007-NC3 c/o Saxon Mortgage Services, Inc., 4708 Mercantile Drive North, Forth Worth, TX 76137, its Successors and Assigns, all beneficial interest under that certain Mortgage dated December 13, 2006 executed by SCOTT T. CARLONE and JOAN M. CARLONE, Mortgagors, and recorded on December 18, 2006 in the Records of Land Evidence of the Town of West Warwick, State of Rhode Island, in Book 1819 at Page 31, describing land therein as:

Commonly known as:     3 Arrow Court, West Warwick, RI 02893
                       Assessors Plat: 12 Lot: 744

Together with the note or notes therein described or referred to, the money due and to become due thereon with interest and all rights accrued or to accrue under said mortgage.

Deutsche Bank National Trust Company, As Trustee
For Morgan Stanley, MSAC 2007-NC3 by Saxon
Mortgage Services, Inc, as its attorney in fact.

BY: _____

Name: _Wayne Kessler_____

Title: _____AVP_____

State of _MN_
County of _Dakota_

On _Sept 9_, 2009, before me, personally appeared _Wayne Kessler_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

JAMES A CHUA
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2013
(this area for official seal)

Notary Public _____
Name _James A. Chua_____
Notary Public in for said State
My Commission expires:_____

Received in West Warwick R.I.
Date Aug 26,2013 Time 11:37A
Paula Iannitelli, Deputy Town Clerk
INST: 00004294
Bk: 2263 Pg: 109

APN #: PLAT 12 LOT 744

Prepared By: Joe Simmons
When Recorded Mail To:
OCWEN LOAN SERVICING, LLC
5720 Premier Park Dr
West Palm Beach, FL 33407
Phone Number: 561-682-8835

## ASSIGNMENT OF MORTGAGE
### RHODE ISLAND

This **ASSIGNMENT OF MORTGAGE** from DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-NC3, whose address is c/o Ocwen Loan Servicing, LLC. 5720 Premier Park Dr, West Palm Beach, 33407 ("Assignor") to DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR THE REGISTERED HOLDERS OF MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-NC3 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-NC3, whose address is c/o Ocwen Loan Servicing, LLC. 5720 Premier Park Dr, West Palm Beach, 33407 ("Assignee")

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Assignor does by these presents hereby grant, bargain, sell, transfer and set over unto the Assignee, its successors, transferees and assigns forever, all of the right, title and interest of said Assignor in and to the following instrument describing land therein, duly recorded in the Office of the Public Records of WEST WARWICK (TOWN) County, State of RHODE ISLAND, as follows;

Mortgagor: SCOTT T. CARLONE AND JOAN M. CARLONE

Mortgagee: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ACTING SOLELY AS NOMINEE FOR NEW CENTURY MORTGAGE CORPORATION

Document Date: DECEMBER 13, 2006     Amount: $ 216,000.00
Recording Date: DECEMBER 18, 2006     Instrument: 00008945
Book/Volume/Docket/Liber: 1819     Page/Folio: 31
Property address: 3 ARROW COURT, WEST WARWICK, RI 02893
Property described as follows:

FOR A COMPLETE LEGAL DESCRIPTION SEE ABOVE REFERENCED RECORDED MORTGAGE

This Assignment is made without recourse, representation or warranty.

IN WITNESS WHEREOF the Assignor has caused these presents to be executed in its name, by its proper officer thereunto duly authorized, the 31ST day of JULY, 2013

DEUTSCHE BANK NATIONAL TRUST COMPANY
AS TRUSTEE FOR MORGAN STANLEY ABS
CAPITAL I INC. TRUST 2007-NC3
BY IT'S ATTORNEY-IN-FACT
OCWEN LOAN SERVICING, LLC

BY: _____
NAME:    Joel Pires
TITLE:   Contract Manager

STATE OF FLORIDA       )
                     )ss.
COUNTY OF PALM BEACH   )

Signed, sealed and delivered in the presence of:

(1)_____ Victoria Vazquez

(2)_____ Janira Walker

The foregoing instrument was acknowledged before me this 31ST day of JULY, 2013, by **Joel Pires** Contract Manager at OCWEN LOAN SERVICING, LLC., ATTORNEY-IN-FACT FOR DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR MORGAN STANLEY ABS CAPITAL I INC. TRUST 2007-NC3, on behalf of the company. He/She is personally known to me.

Notary Public State of Florida
Debra Spruill
My Commission EE 187045
Expires 02/06/2016

Notary Public –
State of Florida     **Debra Spruill**

# Exhibit E



Department of Defense Manpower Data Center

## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:

Birth Date:

Last Name: CARLONE

First Name: JOAN

Middle Name: M.

Status As Of: Nov-20-2017

Certificate ID:

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director

Department of Defense - Manpower Data Center

400 Gigling Rd.

Seaside, CA 93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940).  DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate.  In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33.  If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.  See 50 USC App. ? 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods.  Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

Department of Defense Manpower Data Center



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:

Birth Date:

Last Name: CARLONE

First Name: SCOTT

Middle Name: T.

Status As Of: Nov-20-2017

Certificate ID:

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA 93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940).  DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate.  In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33.  If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.  See 50 USC App. ? 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

Department of Defense Manpower Data Center

SCRA 4.0



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:

Birth Date:

Last Name:      CARLONE

First Name:     JOAN

Middle Name:

Status As Of:   Nov-20-2017

Certificate ID:

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940).  DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate.  In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33.  If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you.  See 50 USC App. ? 521(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.

Department of Defense Manpower Data Center



## Status Report
## Pursuant to Servicemembers Civil Relief Act

SSN:

Birth Date:

Last Name:      CARLONE

First Name:     SCOTT

Middle Name:

Status As Of:   Nov-20-2017

Certificate ID:

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard).  This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. ? 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q33) via this URL: https://scra.dmdc.osd.mil/faq.xhtml#Q33. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. ? 521(c).

This response reflects the following information: (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC ? 101(d) (1). Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available. In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC ? 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds. All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support. This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs). Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate. SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC ? 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction. The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING: This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester. Providing erroneous information will cause an erroneous certificate to be provided.